Jonathan Jacobson from Mylan. I'd like to reserve three minutes of my time for rebuttal. With the Court's permission, I'll start with the point that the relevant market consists of Doric's and its generic equivalents only. So what is a relevant market? A relevant antitrust market is the smallest grouping of products that constrain each other's prices significantly. That's what this Court told us in SmithKline. That's what the agency's merger guidelines tell us. And all the later cases are in the Court. How do we ignore the fact that the record in front of us demonstrates that those in the market considered their own competitors the products elsewhere in the tetracycline market and not limited to Doric's? Industry recognition is one factor. There is very little evidence of industry recognition of the market that we're defining. But the test for relevant market is whether those products constrain the prices of Doric's and the generic equivalents. Well, under your reasoning, isn't every branded drug manufacturer a monopolist prior to genetic entry? Thank you, Judge Barry. The answer is no. The question in every case is whether, in fact, the prices are constrained by other products. And in many cases they are, and in some cases they are not. There are numerous cases that have found generics and the branded equivalent to comprise a relevant market. The Supreme Court's decision in Activists is one. Your decision in BioVale, Judge Barry, is another. There are numerous cases to this effect. The Second Circuit in Geneva against Barr actually held that there were separate markets for the brand and a separate market for the generics. You cite Activists, but there it was conceded there was a monopoly. No, it was not conceded. And if you go to page 2236 of the opinion, Justice Breyer is explaining that the conduct there would not make economic sense but for the fact that the defendant must have had market power. And we have the same thing here. The actions in this case make absolutely no sense if the market is broader than Doric's and its generic equivalents. Why would you spend millions of dollars to take product off the market if your prices were already being constrained by other products? There was a point, Mr. Jacobson, that was made in Judge Diamond's opinion involving the defendant's offering a fixed amount coupon for Doric's to help patients offset the copay. Now, Doric's then removed the coupon or reduced the amount of the coupon, and in response to that, doctors, pharmacists, and patients switched from Doric's to oral tetracycline. Why isn't that the broader market, the correct market in this case? Given the cross-elasticity... Completely get that, Judge. First of all, let's look at the timing. We're talking about 2011 for that couponing event, six years after the initial switcher that caused the massive harm. But more importantly, if you look at that couponing event, we're talking about a $225 price difference. That amounts to, depending on your level of insurance coverage, a 90% to 1,900% price reduction and price increase because the coupons came in and then they came out. And the test for a relevant market that's appropriately used is 5%, sometimes 10%, not 90% to 1,900%. That was a whopping price change, and the evidence is that it was done because Myelin's generic, the 75-100 was coming on the market, and Myelin had filed an ANDA for the 150 milligram generic Doric's. And the evidence, this is at 5-119-20 of the appendix, the evidence is that the couponing change was in response, the acceleration of the coupons was in response to Myelin's entry, and the reduction in the couponing was short-lived because it did have a volume effect. Is it your point that the... The generic manufacturer is not prevented from bringing its product to the market? Well, you're effectively prevented, Judge Barry, by the fact that the prior product was withdrawn. It wasn't just withdrawn. It was forcibly bought back at a cost of many millions of dollars. We know that all of the wholesale inventory was bought back, defendants deny that the retail inventory was brought back, but there is ample evidence in the record that significant retail inventory was bought back as well, specifically Eckerd and Rite Aid. But doesn't that go to the anti-competitive component rather than the definition of the market? Your Honor, it goes to both, and here it's really difficult to separate the two because in our view, and supported by Justice Breyer's decision and activists, the conduct here helps prove the market because the conduct makes no sense if the market is what defendants describe it to be. Well, I know that you've been focusing on the capsule-to-tablet switch. That was the hardest of the switches, yes. But there were others that you've identified, which is the changing in the dosages, but the record also reflects that that alteration was also a response to others in the market, not just generic. So doesn't that give us an idea about what the market is because that's how the defendants were, who they were reacting to? So this is summary judgment. That is a disputed issue of fact. There is ample contrary evidence in the record that, in fact, the switches were designed to prevent generic entry, not to respond to the market. Now that's what you say. This is not what Judge Diamond said. Judge Diamond granted summary judgment after full discovery. He did not find that there were disputed issues of material fact as to what you've just said. That's exactly right, Judge Barry, and that's why the decision should be reversed because the record discloses ample disputed issues of fact on that particular subject. In fact, we thought the evidence was so one-sided in our favor that we moved for partial summary judgment in favor of Myelin. There is ample evidence in the record that all of these switches were designed to prevent or inhibit generic entry. All right, let me ask you this question. Myelin is not a mom-and-pop operation. It's the third largest genetic pharmaceutical company in the world with $6.13 billion in revenue and one out of 11 prescriptions are dispensed in the United States, are Myelin prescriptions. It spends nothing, no money, this is the finding, promoting its very profitable generic versions of Dorix, even while defendants have heavily promoted Dorix, spending $22 million in 2012 alone to do it. Where is the anti-competitive conduct in that? It's all of the product topping cases, there are five of them in addition to Judge Diamond's decision. All of them, even the two that rule in favor of the defendant, recognize that the means of generic entry, the cost-effective means of generic entry, is automatic A-B rated substitution. And if you go to Judge Walker's decision in the Menda case, this is it. That's the one when you said activist, that's the one I was referring to where there is conceded monopoly power. The market definition, again, a single molecule product was not contested in the Menda, that's true. That's right. That's true, but in this case there is overwhelming. Whatever else the Second Circuit's opinion stands for, and it's a distinguishable case, very clearly distinguishable factually and procedurally from this one, it doesn't, you have a big difference here. And you have the one oil farmer's drug. That's it at that time. I understand that, Your Honor, but if you apply the test for defining a relevant market, it's absolutely clear that there is monopoly power here. What defendants are in effect suggesting is that there be a different test for defining a relevant market of pharmaceuticals. So maybe you should move beyond the relevant market into competition. Yes, and this is very much, this is actually worse than the switch in the Menda case, Judge Barry, because in that case the product was simply withdrawn, which is what Judge Walker found to suffice for anti-competitive conduct. He also found it on preliminary injunction, you know, before discovery. No, there was plenty of discovery in the Menda case, Judge Barry. It was a preliminary injunction. Under the standard he had to apply when reviewing an appeal from the ground of a preliminary injunction. It's not the standard we apply here. No, this is an appeal from a summary judgment, and all the issues of fact need to be resolved on our favor in this context. And the conduct there, the legal rule that was announced, was by effectively withdrawing the Menda IR, I'm reading from 654, the opinion, prior to generic entry defendants forced patients to switch from the Menda IR to XR. Where's the coercion in this case, where there were so many options available to those who suffer from the condition this product is meant to treat? Where's the customer coercion? The customer coercion is that Dorix could not be effectively, in terms of a generic product, it was effectively unavailable because AB substitution was prevented. There are dozens of the defendant's documents that not only say this but applaud themselves for doing it. There was a 20-year period when the Dorix brand was unprotected for any patent. That's true. In that 20-year period, and during that period, if I'm not mistaken, Sandoz developed a generic for customers. During that period, why could not Milan have developed its own generic, given its resources? In theory, Milan could. We have to give the defendants credit for, in the early 2000s, building up the demand for the Dorix product. Yes, because they heavily promoted this. They have been heavily promoting their product, and you have not been promoting this particular product at all. Judge Barry, let me respond to that, which is that all of the cases involving product copying reject that very argument because forcing a generic to promote, to detail, to market, raises the generic cost and effectively turns the generic into a product. I am not saying you are forced to do it. I am saying, you know, on the one hand, it comes with some real grace to talk about how well the other side is doing, when you have a very profitable generic without spending two cents. So there's just kind of enough justice here, in my humble opinion. Answer that question. Your red light is on, and then Judge Schwartz has a question for you. Go ahead and answer Judge Barry's question. The point, Judge Barry, is Mylan is a big company. There's no question about it. But in terms of blocking generic entry, Mylan was blocked as much as anyone else. I do want to respond on Sandoz because I want to make sure the facts are clear. So Sandoz was not trying to get into the market earlier. They actually had an ANDA for 75 and 100 milligram capsules. It was approved, and they had difficulty. The Sandoz testimony is that they stopped selling that product. Very few pills were sold, very, very few, not even close to 1% of sales. But Sandoz did have a product in 2006, very few sales. And the Sandoz testimony in the record is that they stopped selling for two reasons. The first reason was that the market had been taken away by the withdrawal of the capsules by Warner Chilcott. And the second reason was that they had difficulty in the shelf life of the product, and it was not meeting FDA standards. Those were the two facts about Sandoz. My question for you is, if we were to adopt your position, wouldn't it mean that the branded manufacturer would cease, they'd be frozen in time, they couldn't change their product? And isn't that inconsistent with the innovation that we all hope is being engaged in by both types of companies, both the brand and generic? Aren't they frozen? No. Tell me why. And again, page 654 of Judge Walker's opinion makes this point better than I can, but I'll try to make the point. We're not saying that you can't introduce new products. That is a fiction that the defendants have invented here. What we are saying is you can't time your withdrawal of the prior version to squelch generic entry, and this is an easy case because they didn't even just leave the old capsules on the market. They got rid of them. But wasn't the evidence that there was the esophageal problems and the stability problems, and so there was a pro-competitive reason for that activity? Your Honor, we don't believe there's a genuine issue of fact on that because we think the evidence is so one-sided in our favor. But even if you accept parts of that argument, you have to send the case back for trial because there is at a minimum a genuine issue of fact on that issue. And let me just add one. I'll respond to you in a second, Judge Fuentes. If anybody has a question, you have to go ahead. The tablet that was initially introduced was larger than the capsules. It was uncoated. It was more difficult to swallow than the capsules. So the esophageal injury argument carries absolutely no weight whatsoever. Okay. I'm sorry, Judge Fuentes. Okay. Every one of these so-called product hops has to be submitted to the FDA. Yes, Your Honor. For approval. Absolutely. And they, in fact, approve each one of these so-called product hops. Not all? No. What they didn't do is say that Myelin had to score the double score, the 150. But, yes, all the others were approved. Ultimately, all were approved. Yes. And my question is if we now agree with you and say these product hops actually are anti-competitive, aren't we second-guessing the process of the FDA? Oh, no, not at all. The FDA has no competition authority whatsoever. Nothing relating to competition goes into the FDA. Not that they don't factor in that this is a good product for the consumer? No. What they factor in is that it meets the safety test that the FDA imposes or, in the case of a generic, that the product is bioequivalent. So does any hard switch trigger antitrust scrutiny? Not if you don't have monopoly power. And I haven't envisioned all situations, Judge Barry, but I believe that most hard switches by a firm with monopoly power would be anti-competitive for the reasons laid out in Judge Jordan's decision in Tricor, in the Suboxone case, and in Judge Walker's decision in Namenda. So they were all off the road. My recollection is correct. They were all on motions to dismiss. Other than Namenda, which was on an evidentiary record. That's true. Your definition of the market, then, in this case, is Dorics and generic Dorics as opposed to Dorics and the larger family of tetracyclines, which essentially attack the same problem. Because there is literally no evidence in the record that any of those other tetracyclines constrain the pricing of Dorics, and there is abundant evidence, certainly in Dr. Nelson's testimony, of just the opposite. Defendants raised prices consistently until generic entry was a reality. They raised prices significantly profitably without losing sales. The 2005 increase was 12 percent, far in excess of the 5 to 10 percent used typically to define relevant markets. When you can increase prices profitably without losing sales to these other products, that tells you, under the tests that are used in every case, that that is a relevant market. Is it customary to have a new product on the market and increase the cost of that product in order to recover the expense of bringing the product to the market? Your Honor, the way I would look at that here is that one of the pieces of evidence that this is anticompetitive conduct is that the manufacturing costs of the tablet were significantly higher than the capsules, notwithstanding the absence of any therapeutic incremental benefit. Okay, Ms. Jacobson, we're going to have to stop you there. Isn't it the case that new products increase consumer choice? Generic forms of the prior products still exist, and those choices remain available in the marketplace. So consumer choice is increased. No, consumer choice here is decreased. There are a lot of products on the market. The only prices that constrain Dorix pricing are Dorix and its generic equivalents. We are not attacking the introduction of new products. I can't emphasize that any more than I have. We are not challenging innovation. We are not challenging the introduction of new products. In this case, what we are challenging is the withdrawal of the prior products, which made generic entry infeasible. And if you go to the court's opinion in Densply, Judge Barry, you'll see that you don't have to exclude everyone. The competitors in that case could have approached the dentist directly and made sales, but the cost-efficient means of distribution was going through the distributors, and the distributors were locked up by Densply, and that's the same thing here. The only cost-effective means of distribution is through A-B substitution. Okay, Mr. Jacobson, we have to get over to the other side. I'm so sorry. That's not a problem. Thank you. Mr. Gidley? Thank you, and congratulations, Your Honor. May it please the Court, Mark Gidley for Appalese, Warner Chilcot, and Maine. I'd like to first address the idea that this complaint does not challenge innovation. If you go back to the complaint before the 100 depositions, the complaint says all four crop tops are predatory, and you need look no further, Your Honor, than the expert report of Philip Nelson. His damages are, quote, in the but-for world, tablets would not have been introduced. So the damage theory of the case is that we're straightjacketed and we can only sell capsules, so from 1985 to 2016. So that means that the American people would have lost four tablet products, including a cure for chlamydia, the 200 milligram, which they no longer challenge. Dr. Nelson jettisoned that. I thought you might address the, how do you describe the relevant market? On the relevant market, Your Honor, we had very efficient means of generic substitution before the A-B entry in 2011 by Mylan. In 2005, if the court would turn to Exhibit 5A, that's found at page A1120 of the joint appendix, that's a chart Philip Nelson, their expert, totally undisputed, generated. And he shows that Dorix in 2005, 2006, had sales no more than 3% or 4% of oral tetracyclines. That's his calculation. Second, even if you zero it in to doxycycline high-clate, which you shouldn't because doxy is doxy, as the testimony showed, even if you just look at the salt doxycycline high-clate, he shows 438,000 prescriptions for generic. This is in 2005, Monopoly 2005, and 28,000 for Dorix. So Dorix was outsold 16 to 1 by the generic. Why is that? There are three experts you would turn to.  No, not generic Dorix, Your Honor. Generic immediate-release doxycycline high-clate and immediate-release doxycycline monohydrate. And ironically, Mylan used to sell the IR. They had an IR product. They bailed out in 2001, the record shows, because they just weren't interested in the market anymore. Their CEO said, We're not that interested in antibiotics. At any rate, getting back to product market, why did this switch occur? There's three experts whose unrebutted testimony, by the way, only the defendants studied switching. There's no switching expert by either Rubenfeld or Nelson. They didn't study switching. But you've moved from your anti-anti-competitive. Can you just talk to us about the market? Just to be clear, for me, the switching is a key part of the product market. So unlike Namenda, where you have people that are compromised, these are teenagers. Mr. Jacobson puts it very, very simply. The market is Dorix and generic Dorix. That's it. Right. If that's so, it's a very large market. He says that that only happens because of the pricing evidence, and he bases that on Dr. Nelson. Dr. Nelson shows pricing charts. If you take a look at those pricing charts, and, Your Honors, this is found in the appendix at A1135, 5233, and 1137. The first is the pricing chart of Dorix versus Adoxa. So that's another brand, Adoxa Cyclin. The price is identical, according to Nelson, both in his verbal testimony, found at 1006, and in his chart that shows it pictorially at 1135, Exhibit 18A. Now, the same thing is true for Vibramicin, that was sold by blockbuster company Pfizer. Vibramicin is slightly higher, but well within 5%, and they're all slightly going up over time. The contention of Mylan is your price is going up, and it's higher than generic, game over. Well, that describes every brand product in this economy, as well as every brand drug. Finally, in Monodox, if we look at 1137, the same thing is true in 2005. The price lines touch. So your position is that there were other brands in the market, the prices were the same as your clients, therefore they are all part of one market. The Dorix-only market is dead. And then what about the generics? I told you that, according to Nelson, the generics, not the Dorix generic, but the generics for the IR were outselling 16 to 1. What was being done? Two things. One, coupons. The unrebutted testimony in this record is that couponing occurred from 2005 to 2010 to the tune of $230 million. So, in other words, before the first AB-rated tablet was sold by Mylan, we spent a quarter of a billion dollars on coupons. Second, I would ask the court to take a look at the following memorandum in 2004 from Mr. McNamara. This is found at A1923. McNamara outlines the strategy for the switch, and he makes the following observations, and two I'll call out. One is, we're going to have to sample to get our price down to the generic, because this is a market awash in generics. Now, how does that work? In the real world that worked, that if you go to the doctor's office, our detail person has given the doctor free samples. Then to the family with the teenager, they get a sample. That might be the first month's supply, and our hope when we have our salesperson calling that doctor is then they'll refill with Dorix. The second strategy is to use the coupons, which were used liberally. Second, this memo also says that the esophageal ulceration issue, which, by the way, is unrebutted, so we had a nine-fold reduction in esophageal events. It's rare, but a nine-fold reduction. The more important Sherman Act element of esophageal ulceration, Your Honors, is that the competitors were attacking us using esophageal ulceration. So Mr. McNamara's memo says, one thing that's going to go on with the tablet is, when we go to the tablet, we're going to sell more, because the perceived safety of something that doesn't have the esophageal event. And this was something Addoxa hammered all the time. You were mentioning memos. I did want to ask you a question. It's raised by the other side, and that has to do with the internal Warner documents that suggest that the reason for these changes are to protect the franchise. Right. Two points on that. First, we'll certainly admit that there are documents that say anti-generic effect. The judge below assumed that the primary intent was anti-generic. However, that doesn't mean anti-competitive. That means competing against the generics. Some of those documents are talking about the IR generics. Well, you see, there's zippers between competing against the generics and getting rid of the generics. Well, at no point did we. We were outsold 16 to 1 and 13 to 1 by the generics. So at no point in time were we coming to the office not facing generics. I said there were three experts on switching, and I'll address generics there. Dr. Canu showed that there was switching before the AB-weighted generic, 55% to the IR. Second, the only expert to look at managed care, which is the missing piece of the FTC brief, and it's something not dwelled on, although picked up by Judge Simon and not dwelled on by the other side, is managed care in this period 2005 to 2010. Eighty percent of plans put DORCs on a disadvantaged tier. Going back to your question, Judge Fuentes, about intent, the two kickoff documents that I think are pivotal that show that maybe there was mixed intent, but strong intent that is pro-competitive is the 1997 memo, which was the proposal that was given to Maine. Back in 1996, there were $2.1 million sold of DORCs. DORCs was a failed product. One of Chilcot, which was only two years old, showed up and said, we think we can get maybe $13 million in sales if we get a sales force out there talking about the benefits of DORCs. That memo also says that the tablet, unlike the capsule, will be able to be snapped in half, which means the doses can titrate, meaning you can blast the acne at 100 milligrams and then have a maintenance dose of 50. You cannot do that inherently with a capsule. In addition, the 2000 invention disclosure memo that Maine wrote is, it's critical reading in this case. It says, first, the tablet will eliminate the esophageal ulceration issue, and it did, and second, it talks about the greater shelf life stability. It gives a big concern. You said that there are conceivably commentary within the record about an anti-generic strategy. You also said there's evidence in the record that would demonstrate pro-competitive reasons for, we'll focus on the capsule for this discussion, that would justify the change. Is that an issue of fact? No, not at all. It's an issue for this court. First of all, here, as a matter of law, the fact that you have an anti-view of your competition is to be applauded. There's evidence in the record that says they have an anti-brand intent. They, of course, have an anti-brand business model. That's exactly what they do each and every day, is they get up and do copycat drugs from the brand. So from your point of view, that's an anti-competitor position, not anti-competition position. Right. Am I understanding you right? That's correct, Your Honor, and that every competitor in the United States worth his salt and is red-blooded would have those documents. The key question is, did you do something anti-competitive? And so this is a case, Your Honors, where there are no exclusionary contracts, right, so it's nothing like Microsoft, nothing like LePage's, no bundled rebates. All of those opinions of this court start with 80 or 90 percent market share, 95 percent market share. You just had a decision in Asai versus Sanofi, 60, 80 percent market share. There's nothing like that here. And the conduct is different in character than all of those cases. Let me ask you a question about a comment in the brief that was filed by the FTC. It's at page 13. I was surprised to read this, but it says, the very fact of product hopping can itself be evidence of monopoly power, which is exactly what you were doing. You know, I come back to what we are all doing here today is we try to fashion legal rules. And at the end of the day, whatever this court rules is going to be heard everywhere. And so I try to think, what would I be able to say as the general counsel or outside counsel to a company would be a product improvement that would be legitimate? And there's no standard in that brief that the FTC put out. In Allied Orthopedic, the Ninth Circuit struggled with this in 2010, and the discussion in Allied Orthopedic at page 1,000 basically says, look, we have the PTO that has, you know, a well-tried path of law, but in terms of trying to judge one product versus another as superior, they say courts can't do it. And we've been through 120 depositions. There's no test that's provided for you in the record. And I think that answers the question about whether there can be product hopping per se. Well, how do we craft a test, because that's what you're asking us to do, in a market where we have to be mindful of the goals of Hatch-Waxman, right, we have to be mindful of that, that ensures both we do not act contrary to Hatch-Waxman's goals and allow for innovation without having this sort of behavior of these sort of incremental changes that may or may not be beneficial. So tell us what test you'd like us to do. Sure. Well, first of all, you'd be reaching to do the test in this case, right? They're not going to have a generic of a capsule until mid-2008. Sando went forward and thought it was an advantage to go forward with a generic capsule when we were no longer selling it. They quit. Their evidence is the earliest they would have a drug is in 2008. So there's nothing in terms of buyback and inventory that had any effect on them. They have no standing. They have no product. And the only product that they had failed the fasting test. The second point is this is wildly different than Namenda. You don't have very compromised people who maybe because of the nature of the disease don't want to go from twice a day to once a day, the reverse commute language in that decision. That decision also talks about safety rationales. We have an undisputed safety rationale with the esophageal ulceration, and it has a competitive overlay because even if it's rare, our competitors were going to doctors hammering that message in their detailing. That's the ADOXA. Is it the situation that we have to compare what is so innovative about the product, versus what the FTC says that product making minor changes to drug formulation is designed to thwart generic substitution? So let me make two points on that, Your Honor. Is it that we have to strike a balance somewhere? First of all, two-thirds of the drugs the World Health Organization considers essential, all countries should have access to, two-thirds of them are incremental. Lipitor was the seventh statin. It was so incremental 50% of the revenues were given up at inception. It turned out to be a blockbuster. When you're in the lab, you don't know whether you have a blockbuster, a medium blockbuster, or something that's an incremental change. So incremental innovation is what we all need in pharma. That's the national system. Is this for courts to decide? Is this for courts to decide whether the change is beneficial, whether it's good, bad, and different? Isn't it something that should be the real goal, I hear, to preserve the special pathway to consumers created by the substitution laws? Let me address that. On the most efficient pathway, we're losing by a significant amount. Is this something we should be deciding whether one particular, every time there is a product topping, that this is for the court? I think not ultimately, Your Honor. But you're not suggesting product topping is always lawful. Well, I'm guided by what other courts have done where they've agonized. The Ninth Circuit, an allied orthopedic, basically said there's no test. And Ninth Circuit was building on CalCom, which was the IBM plug compatibility cases. So in the computer industry, we've already faced this. Berkey Photo also said innovation itself, innovation simpliciter, is lawful. Legan says we want new products. So if we're going to craft some kind of law of product topping, first of all, you don't get to first base if we have 18% or 3% market share. The FDA has already reviewed the product and has signed off on it. But they don't consider competition and they don't consider innovation, do they? Well, the FDA is pretty tough to get through. When we presented the 200 milligram, they vetoed it on acne. We had to go and do a new clinical trial on chlamydia. But to Judge Fuentes' point, it's not because they're evaluating whether it's anti-competitive in some way. They're doing a medical analysis of whether it's a worthwhile product. Their mandate is safety and efficacy. But like any bureaucracy, they're going to reach for the breakthrough cures, right? And so when you have an oral antibiotic in a crowded field, they basically told us on 200 milligram dorks, forget it. And we had a three-year delay while we went out and did clinical trials and created a new cure for chlamydia, a very serious sexually transmitted disease. But I think my final point on whether you need to craft a test or not is look at the courts that have looked at predatory innovation. And those are three, Berkey Photo, Allied Orthopedic, and CalCom. And they agonize. They think this is a very sort of sketchy enterprise, for lack of a better word. And let's look at exclusionary conduct. They had free access to retailers and to managed care. The most study shows that managed care payors shifted 80 percent of all prescriptions to generics before there was an AB-rated generic. So this case is a polar case. If you find that this goes to a jury, I don't know what case could ever be screened out on market power. There's nothing probably more fragmented, Your Honors, than acne. It's been around a long time. Our innovations and our marketing caused a 40 percent increase in output. That is an unqualifiedly good thing under the Sherman Act. Mr. Gidley, thank you very much for your argument. Mr. Jacobson. Thank you. That was an excellent argument for the jury. Fundamentally, every fact that Mr. Gidley said is disputed by substantial evidence in the record. Let me start with one. Nine-fold reduction in esophageal ulceration. Well, the data for that, this is at 6731 and 6739 of the appendix. Their own expert in- You're not doubting that that was a problem, are you? Pardon me? You're not doubting that that was a problem, are you? I'm not doubting that it was a problem. I am saying that the evidence in the record that Mr. Gidley cites, the FDA says you can't use for that purpose, and their own expert admitted you can't use those data for that purpose. Absolutely clear in the record. How about the fact that that capsule was banned from use in two different countries, Sweden and France? It was all oral tetracycline capsules were banned in France and Sweden. In Australia, where Maine is located, the capsule continued. Maine thought it was just fine to continue with the capsule there. In the United States, there's substantial evidence in the record that to further fend off generic competition, defendants considered going back to the capsule in 2011-2012. So the idea that the tablet would fix this problem is funny, with all respect. And as I said, the evidence in the record from Dr. Jackson and others is that a large, uncoated tablet is much more difficult to swallow and is going to cause inherently greater esophageal problems than the capsule that was being replaced. So that's number one. Number two, let's talk about the product that defendants say is most, their strongest argument for being in the relevant market other than Dorix is Edoxa. But the evidence is conclusive that Edoxa can't be in the market. Now, how do we know that? When generic Edoxa was introduced, Dorix sales continued to go up. If they were in the same market, the introduction of the far lower-priced generic Edoxa would have caused a loss of sales. That's just basic economics for Dorix, and it didn't. So attorneys of the law, Allied Orthopedic. Allied Orthopedic, page 594 of the decision, recognizes that product withdrawal can be a problem. There was no product withdrawal in the case. They cited Berkey, which says the same thing. You can see the reliance on Berkey and Judge Walker's amended decision. He didn't mention the Microsoft case, another quote-unquote predatory innovation case, and I would say this is not a predatory innovation case. It's a product withdrawal case. But the Microsoft case says that you have to balance these effects. So Allied disagrees with Microsoft on that, but that's not something the Third Circuit needs to reach in this case because the problem here is the withdrawal of the prior versions. We have to finish up, Mr. Jacobson. The red light is on. Just one point on output, which is the output of Dorix declined significantly, 11 to 12 percent, after the initial hop, 2005 to 2007. There was couponing in 2005 at a trivial level just to get physicians to understand, to prescribe the tablet, that this would be a way of introducing the doctors to the tablet. The couponing didn't accelerate in earnest until Mylans-Anda was on file after December 2008. I'm sorry for going over length, and I appreciate the Court's indulgence. Hold on a second. Judge Barry? No, nothing else. Thank you, Mr. Jacobson. And, Mr. Gitley, thank you very much. The case was very well argued, and we'll take the matter under advisement.